## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KEN EZEAH**, | |
| Plaintiff, | |
| v. | Case No. 24-cv-00076 (TNM) |
| **FEDERAL BUREAU OF INVESTIGATION**, | |
| Defendant. | |

### <u>MEMORANDUM OPINION</u>

Ken Ezeah requested records under the Freedom of Information Act from the Federal

Bureau of Investigation.  The FBI released responsive records and now moves for summary

judgment.  For the following reasons, the Court will grant the FBI's motion.

### I.

Ezeah is serving a 132-month prison sentence after pleading guilty in the Western

District of Oklahoma to one count of conspiracy to commit wire fraud.  *United States v. Ezeah*,

2017 WL 11513243, at *1 (W.D. Okla. Oct. 25, 2017).  On February 10, 2023, Ezeah wrote:

> 1) I would like copies [of] the transcripts and interview
> reports of all three proffer interviews I participated in
> with F.B.I. Agent Tim Schmitz and my trial attorney Bob
> Wyatt the first of which began on the 2nd of February
> 2017 at the Federal Court house in Oklahoma [C]ity.
> . . . .
>
> 2) I would like copies of all complaints both formal and
> informally recorded of on duty misconduct ever filed
> against F.B.I. Agent Tim Schmitz while he was under the
> employ of the F.B.I.[1]

---

[1]  *See United States v. Ezeah*, 2016 WL 7410735, at *2 (W.D. Okla. Dec. 22, 2016) ("Special Agent Tim Schmitz of
the FBI . . . identified Ezeah as the resident of [an] address" in Houston, Texas, searched pursuant to a warrant.).

Decl. of Michael G. Seidel ("Seidel Decl."), Ex. A, ECF No. 17-2, at 2–3.  Two weeks later, the FBI acknowledged receipt of the request, replying that it "will neither confirm nor deny the existence" of records pertaining to Agent Schmitz, that is, the records Ezeah requested in Item 2.  Def. Ex. B., ECF No. 17-2, at 7 (citing FOIA Exemptions 6 and 7(C)).  This is the FBI's "standard response" to requests for records on third parties because the "mere acknowledgement of the existence of FBI records on third party individuals could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.*

The FBI conducted a search on the Central Records System, which contains applicant, investigative, intelligence, personnel, administrative, and general files throughout the agency.  Declaration of Michael G. Seidel, ECF No. 17-1, ¶ 23.  This is the only database that would be reasonably expected to house the requested records because agency personnel policy requires storing records there.  Seidel Decl. ¶¶ 22, 24, 25 n.5, 31–33.  A search by the terms "Ezeah, Ken" located 31 pages responsive to the first item in the request.  Seidel Decl. ¶¶ 8, 28–32; Def. Stmt. of Material Facts, ECF No. 17-4, ¶ 4.  The responsive records were exempt from disclosure under the Privacy Act, yet the agency still reviewed them under FOIA to achieve maximum disclosure.  Seidel Decl. ¶ 35.  The FBI released to Ezeah seven redacted pages and "subsequently released one additional page of records, in part," after further segregability review.  Seidel Decl. ¶¶ 8, 11 & n.1; Def. Stmt. Material Facts ¶¶ 6–7.  The mailed release was returned as undeliverable.  Seidel Decl. ¶¶ 9, 11; Def. Ex. D, ECF No. 17-2, at 15–20.  After Ezeah filed suit, the FBI "reissued the processing determination" and mailed it "by USPS, Certified Mail" to the "same address as the original release."  Seidel Decl. ¶¶ 10–11 & n.2.  Ezeah "signed for the reissued determination on November 12, 2024."  Seidel Decl. ¶ 11 n.2.

The FBI withheld information under FOIA Exemptions 5, 6, 7(C) and 7(E), codified in 5 U.S.C. § 552(b). Seidel Decl. ¶¶ 8, 11; Def. Ex. C, ECF No. 17-2, at 10–14; *see* Decl. of Auborn Finney ("Finney Decl.") ¶¶ 4–14, ECF No. 17-3. The agency moved for summary judgment in February. Shortly afterward, the Court directed Ezeah to respond to the FBI's motion. Order, ECF No. 18 (*Fox-Neal* order). Ezeah has neither filed a response nor requested more time to respond. The FBI's motion is ripe for decision.

## II.

A court cannot treat an unopposed summary judgment motion as conceded. It "must determine for itself that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law, and then 'should state on the record the reasons for granting or denying the motion.'" *Winston & Strawn v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). FOIA requires federal agencies to "disclose information to the public upon reasonable request unless the records at issue fall within specifically delineated exemptions." *Jud. Watch, Inc. v. FBI*, 522 F.3d 364, 365–66 (D.C. Cir. 2008). The agency "bears the burden of proving the applicability of claimed exemptions." *See ACLU v. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011). Even if an exemption applies, the records must still be released unless the agency shows that release would cause "reasonably foreseeable harm to an interest that the exemption protects." *Leopold v. Dep't of Justice*, 94 F.4th 33, 37 (D.C. Cir. 2024). The agency "must provide a focused and concrete demonstration of why disclosure of the particular type of material at issue will, in the specific context of the agency action at issue, actually impede the interests protected by a FOIA exemption." *Id*. (cleaned up).

A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102

(D.C. Cir. 1983).  The Court may grant summary judgment based solely on the agency's declarations if they are not contradicted by record evidence or by evidence of the agency's bad faith.  *See Aguiar v. DEA*, 865 F.3d 730, 734–35 (D.C. Cir. 2017).  Such declarations receive "a presumption of good faith."  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  An agency's justification for withholding records "is sufficient if it appears logical or plausible."  *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (cleaned up).

## III.

The FBI contends that it conducted an adequate search for responsive records and released all non-exempt information.  The Court first analyzes the search and then the FBI's withholding justifications.

## A.

An inadequate search for records is an improper withholding under FOIA.  *See Steinberg v. Dep't of Justice*, 23 F.3d 548, 551–52 (D.C. Cir. 1994).  An agency's "search need not be perfect, only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request."  *Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986).  The Court examines the agency's search by the "appropriateness of [its] methods," not by its "fruits."  *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003).  So the key question is "whether the search was reasonably calculated to discover the requested documents."  *SafeCard Servs., Inc.*, 926 F.2d at 1201.

To succeed on summary judgment, the agency may rely on "a reasonably detailed affidavit," *Iturralde*, 315 F.3d at 313–14, establishing "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  This

4

entails setting forth the search terms, describing the type of search performed, and "averring that all files likely to contain responsive materials (if such records exist) were searched."  *Id*.

The FBI's declaration provides sufficient details about the scope of the first search to find that it was adequate and conducted in good faith.  The declarant describes the "extensive" Central Records System, plausibly explains why it was the most likely location to find responsive records, attests to there being no other location likely to contain responsive records, sets out the search terms, and describes the search method.  Seidel Decl. ¶¶ 22–33.  The record contains no evidence contradicting the thoroughness of the FBI's search.  Therefore, summary judgment on this aspect of the FOIA claim is appropriate.

## B.

The Court next assesses whether the FBI properly asserted various FOIA exemptions.  Recall that the FBI withheld information under FOIA Exemptions 5, 6, 7(C), and 7(E).  Seidel Decl. ¶ 39.  The FBI must show both that a particular exemption applies and that foreseeable harm exists from disclosing any withheld information.  *See Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 370 (D.C. Cir. 2021) (citing 5 U.S.C. § 552(a)(8)(A)(i)(I)).  Agencies must articulate this foreseeable harm in a "focused and concrete" way.  *Id*.  But even without a sufficient explanation from the agency, the "context and purpose" of withheld information can support a finding of foreseeable harm.  *Id*. at 372.  And agencies can more easily meet their foreseeable harm burden when invoking exemptions "for which the risk of harm through disclosure is more self-evident."  *Reps. Comm. for Freedom of the Press v. CBP*, 567 F. Supp. 3d 97, 120 (D.D.C. 2021).  Finally, the FBI must also show that it released all reasonably segregable materials.  *See Johnson v. EOUSA*, 310 F.3d 771, 776 (D.C. Cir. 2002).  With these principles in mind, the Court addresses the FBI's withholding justifications.

**1.**

The FBI withheld 18 of 31 reviewed pages under Exemption 5.  *See* Def. Ex. F, ECF No. 17-2, at 56–58 (*Vaughn* Index).  Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  This provision "incorporates the privileges available to Government agencies in civil litigation," including, as asserted here, "the deliberative process privilege."  *Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 267 (2021); *see* Seidel Decl. ¶ 39 (Summary Chart).  That privilege recognizes the need for candor in the brainstorming stages by protecting, for example, "recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (cleaned up).

To determine whether Exemption 5 applies, courts ask whether a document is "predecisional" and "deliberative."  *Sierra Club*, 592 U.S. at 268.  "Documents are predecisional if they were generated before the agency's final decision on the matter."  *Id*. (cleaned up).  And "they are deliberative if they were prepared to help the agency formulate its position," *id*. (cleaned up), or if they "reflect[ ] the give-and-take of the consultative process," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980).

The FBI withheld "draft documents" containing the handwritten notes of a special agent's "thoughts, ideas, impressions, interpretations," and "investigative talking point[s]" appearing on evidence presented "during [an] investigatory interview [with Ezeah] to obtain [his] . . . feedback."  Seidel Decl. ¶¶ 44–46.  The FBI attests that such documents are "inherently part of the deliberative process to obtain potential investigatory leads" and that they helped evaluate Ezeah's assistance "for a potential proffer agreement."  Seidel Decl. ¶ 45.  The notes were

"fleshed out and distilled during the editorial process for the creation of the official FD-302 interview report," which is "the FBI's final decision[.]"[2]  *Id.*  The declaration establishes the withheld pages as (1) generated before finalization of the official FD-302 report, (2) helping to formulate a position on plea negotiations, and (3) shared only internally.

More, the FBI has explained the foreseeable harms in disclosing the information.  It attests to the "chilling effect" on special agents being candid in their assessments, the risks of revealing "internal deliberations and sorting of a multitude of ideas," and "public confusion" over information, including preliminary "investigative strategies," that might not end up in the final, official report.  Seidel Decl. ¶ 46; *cf. Reps. Comm.*, 567 F. Supp. 3d at 120 (accepting "public confusion" as a foreseeable harm in disclosing draft documents).  So the FBI's invocation of Exemption 5 is justified.

**2.**

The FBI also withheld and redacted information under Exemptions 6 and 7(C), both of which permit an agency to withhold information if its disclosure would harm personal privacy. *See Reps. Comm.*, 567 F. Supp. 3d at 125–27 (allowing an agency to withhold "non-public facing" employees' names while disclosing senior officials' names and agents' names that had already appeared in the public domain).  Though the two exemptions are similar, 7(C) "provides broader privacy protections than Exemption 6" and "thus establishes a lower bar for withholding material."  *CREW v. DOJ*, 854 F.3d 675, 681 (D.C. Cir. 2017); *compare* 5 U.S.C. § 552(b)(6) (allowing withholding of information whose disclosure would be "a clearly unwarranted invasion of personal privacy") *with id.* § 552(b)(7)(C) (allowing withholding of information whose disclosure "could reasonably be expected to constitute an unwarranted invasion of

---

[2]  *See Vaughn* Index, ECF No. 17-2, at 55 (describing "FD-302s" as "internal FBI forms in which evidence is often documented, usually the results of FBI interviews," that are used "in furtherance of the FBI's investigative efforts").

personal privacy"). So when agencies rely on both Exemptions 6 and 7(C) for the same material, and that material clearly falls fully into 7(C), the Court need not "consider Exemption 6 separately." *Roth v. Dep't of Justice*, 642 F.3d 1161, 1173 (D.C. Cir. 2011).

Here, the FBI invokes the two exemptions in tandem for documents that, by the terms of Ezeah's request, were "compiled for law enforcement purposes" as 7(C) requires. *See* Seidel Decl. ¶ 39 (Summary Chart); *Roth*, 642 F.3d at 1173 ("If the information withheld here was compiled for law enforcement purposes, thus implicating Exemption 7(C), then we would have no need to consider Exemption 6 separately . . . .") (cleaned up); Def. Ex. A at 2–3. A record is compiled for law enforcement purposes if it is compiled for a "federally authorized" law enforcement purpose and the nexus is based on a rational, "colorable claim." *Keys v. Dep't of Justice*, 830 F.2d 337, 340, 343 (D.C. Cir. 1987) (emphasis omitted). The FBI declarant attests that the agency investigates all violations of federal law not exclusively assigned to another agency, Seidel Decl. ¶ 47, and that the "records at issue were compiled in furtherance" of its "investigation of crimes related to federal security and or [sic] commodities fraud matters," Seidel Decl. ¶ 48. The FBI thus satisfied the law enforcement requirement. Accordingly, the Court considers only Exemption 7(C).

Exemption 7(C) protects from disclosure any law enforcement records that "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). "To determine whether an invasion of privacy is 'unwarranted,' courts balance the privacy interest against the public interest in disclosure, including any potential interest in airing governmental misconduct." *Prot. Democracy Project, Inc. v. NSA*, 10 F.4th 879, 889 (D.C. Cir. 2021). Plaintiffs must show a "significant" public interest "more specific than having the information for its own sake," and that the information would "advance that interest." *Nat'l*

*Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004).  Plaintiffs must make both showings to justify an "invasion of privacy."  *Id.*  The D.C. Circuit has "consistently supported nondisclosure of names or other information identifying individuals appearing in law enforcement records, including investigators, suspects, witnesses, informants," *Schrecker v. DOJ*, 349 F.3d 657, 661 (D.C. Cir. 2003), and "federal government personnel," *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011).  Under 7(C), "privacy interests" in "private information" are "particularly difficult to overcome when law enforcement information regarding third parties is implicated."  *Id.*

The FBI relied on 7(C) to redact the names and other identifying information of third-party individuals—including special agents, professional staff, persons merely mentioned, persons of investigative interest, and victims.  Seidel Decl. ¶¶ 53–58.  The FBI plausibly explains the risks to privacy if it were to release such information, including compromising special agents' ability to conduct other investigations by subjecting them to unofficial questioning and potentially violent reprisal.  *See id.*  The FBI attests that "each piece of information was scrutinized to determine the nature and strength" of each individual's privacy interest, which "was balanced against the public's interest in disclosure."  Seidel Decl. ¶¶ 51, 54 (performing the balancing for FBI special agents), 55 (doing the same for FBI professional staff), 56 (doing the same for third parties who were merely mentioned as associated with the investigation), 57 (doing the same for third parties of investigative interest to the FBI), 58 (doing the same for victims); Finney Decl. ¶ 9.

Ezeah, on the other hand, has not asserted any public interest that would override these privacy concerns.  "Where there is no identifiable public interest, the privacy interest protected by Exemption 7(C) prevails because something, even a modest privacy interest, outweighs

nothing every time." *Kowal v. Dep't of Justice*, 107 F.4th 1018, 1031 (D.C. Cir. 2024) (cleaned up).

The FBI has plausibly explained more than a "modest privacy interest" that would be foreseeably harmed for each of the third-party categories. For the special agents, past targets and their associates would seek to "inflict violence." Seidel Decl. ¶ 54. FBI administrative staff would experience similar reprisals and harassment based on their access to investigative information. Seidel Decl. ¶ 55. Third parties merely mentioned would be criticized or suspected of wrongdoing. Seidel Decl. ¶ 56. Investigative targets would experience a "negative stigma[]" with "professional and social repercussions." Seidel Decl. ¶ 57. Finally, victims would be embarrassed by "unsolicited and unnecessary attention" and a "further invasion of their privacy." Seidel Decl. ¶ 58. The agency has systematically detailed foreseeable harm as to each redacted type of personal information.

In sum, the agency has justified invoking Exemption 7(C) and demonstrated foreseeable harm from releasing the exempted information. Its motion based on Exemption 7(C) will be granted.

### 3.

Exemption 7(E) protects information that "would disclose techniques and procedures for law enforcement investigations or prosecutions," or disclose guidelines for law enforcement investigations or prosecutions if such disclosure could "reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The D.C. Circuit has "set[ ] a relatively low bar for the agency" to justify 7(E) withholdings, requiring it only to "demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42. Any information that "could *increase the risks that* a law will be

violated" is protected from disclosure. *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009) (emphasis in original).

The FBI applies this exemption "to non-public investigative techniques and procedures" and "non-public details about techniques and procedures that are otherwise known to the public." Seidel Decl. ¶ 61. It redacted three categories of information: (1) sensitive investigative file and subfile numbers; (2) methods used to collect and analyze information; and (3) foci of specific investigations. Seidel Decl. ¶ 39 (Summary Chart). The Court addresses each category.

*First*, the FBI attests that the withheld file numbers "are not known to the public." They contain "three separate portions" that "indicate the types of investigative and intelligence gathering programs to which these files pertain." Seidel Decl. ¶ 62. "Many of the FBI's classification numbers are public" and thus the withheld file numbers would be "telling" if disclosed. *Id*. The file numbers also include office codes revealing the origins of investigations, which, if disclosed, "would provide critical information about where and how the FBI detected particular criminal behaviors or national security threats," Seidel Decl. ¶ 63. Finally, they contain numbers assigned to "unique investigative initiatives," which, if disclosed, "would provide criminals and foreign adversaries with a tracking mechanism" to follow "particular files/investigations within the context of larger FBI investigative efforts," Seidel Decl. ¶ 64. "Repeatedly releasing" such sensitive information "would allow . . . criminals and foreign adversaries to obtain an exceptional understanding" of "investigative intelligence available to the FBI." Seidel Decl. ¶ 65. This, in turn, would enable wrongdoers to circumvent the law by predicting FBI investigations and structuring "their behavior to avoid detection and disruption by FBI investigators[.]" *Id*.

*Second*, the FBI withheld "the methods" used "to collect and analyze information"

gathered for investigative purposes.  Seidel Decl. ¶ 66.  It attests that if released, such

information would disclose "how and from where the FBI collects information and the

methodologies employed to analyze it[.]"  *Id.*  The FBI plausibly explains that release would,

among other risks, "enable" wrongdoers "to educate themselves about the techniques employed

for the collection and analysis of information" and "allow [them] to take countermeasures to

circumvent" these techniques so that they could "continue to violate the law[.]"  *Id.*; *cf. Shapiro

v. Dep't of Justice*, 893 F.3d 796, 800 (D.C. Cir. 2018) ("We allow the FBI to withhold records

under Exemption 7(E) on the basis that releasing them would provide information on how a

database is searched, organized and reported." (cleaned up)).

 *Finally*, the FBI withheld the foci of "investigations of crimes related to federal security

and or [sic] commodities fraud matters" that "have not been publicly disclosed."  Seidel Decl. ¶

67.  It attests that the release of such information "would allow targets" of the investigations "to

thwart FBI efforts to investigate/disrupt their activities," provide "key information about . . .

investigative strategies for pursuing" such crimes, and reveal the agency's "intelligence/evidence

gathering capabilities," which in turn "would enable criminals to circumvent the law[.]"  Seidel

Decl. ¶ 69.

 Exemption 7(E)'s substantive standard "already forces the agency to show some risk of

[foreseeable] harm."  *Reps. Comm. for Freedom of the Press v. FBI*, 754 F. Supp. 3d 56, 67

(D.D.C. 2024) (collecting cases).  Showing that the information's release "could increase the

risks that a law will be violated" already provides "at minimum, a strong clue."  *Id.*; *Mayer

Brown*, 562 F.3d at 1193 (emphasis omitted).  But the agency also should discuss foreseeable

harm as a "distinct, consecutive inquir[y]."  *Leopold v. Dep't of Justice*, 94 F.4th 33, 37 (D.C.

Cir. 2024); *Reps. Comm.*, 754 F. Supp. 3d at 64–66 (rejecting the argument that Exemption

7(E)'s substantive standard already answers the foreseeable harm inquiry).  The FBI has done so

for all three types of exempted 7(E) information.  Releasing each would increase the likelihood

that criminals could more easily "circumvent the law."  File and subfile numbers betray the

physical location and tracking number of investigations, informing lawbreakers about current

agency activities; information collection methods would educate criminals about evasion; and

details about current targets would enable persons of interest to flee or obstruct justice.  Seidel

Decl. ¶¶ 65–69.  Foreseeable harm to Exemption 7(E)'s protected interest—increasing the risk of

law violation—would result.

      As to all three categories, the Court will grant the FBI's motion based on Exemption

7(E).

### 4.

      To properly justify exemptions, the FBI must also "demonstrate that all reasonably

segregable material has been released."  *Johnson*, 310 F.3d at 776.  To meet this burden, the

agency need only show that the information it has withheld cannot "reasonably" be further

segregated.  *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).  The FBI has met

this burden through the combination of its declaration and *Vaughn* Index.  Seidel Decl. ¶¶ 1–73;

Ex. F at 55–58.  It attests that each responsive page was reviewed to release all reasonably

segregable information.  Seidel Decl. ¶ 72.  Eight pages contained "a mixture of material that

could be segregated for release" and 23 pages "required withholding in their entirety."  Seidel

Decl. ¶ 72.  The fully held pages contained information "either fully covered by one or more" of

the cited FOIA exemptions or non-exempt information "so intertwined with exempt material

[that] no information could be reasonably segregated for release."  *Id.*; *see Mead Data Cent. v.*

*Dep't Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977) ("It has long been a rule in this Circuit that

non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions."). The agency's justification for segregating information "appears" both "logical" and "plausible." *Larson*, 565 F.3d at 862.

**5.**

Finally, recall that the FBI responded to item two of Ezeah's request by neither confirming nor denying the existence of complaints filed against the FBI agent who interviewed him. *See supra* Section I. Such is known as a *Glomar* response.[3] It is properly invoked when "the fact of the existence or nonexistence of agency records" itself falls within a FOIA exemption. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). The FBI has adopted this policy for all third-party individuals, including special agents, "unless the requester establishes a significant public interest in disclosure that outweighs the third party's privacy interests." Seidel Decl. ¶ 16. Recall that Ezeah has not done so. *See supra* Section III.B.2; *cf. Schubert v. FBI*, 2024 WL 341173, at *4 (D.D.C. Jan. 29, 2024) (showing Seidel offering the same *Glomar* response "[p]ursuant to longstanding policy").

When reviewing a *Glomar* response, courts "apply the general exemption review standards established in non-*Glomar* cases." *Knight First Amendment Inst. v. CIA*, 11 F.4th 810, 813 (D.C. Cir. 2021). The agency thus bears the burden to justify a *Glomar* response. *See* 5 U.S.C. § 552(a)(4)(B) (stating that the "burden is on the agency to sustain its action").

The FBI has met its burden here. It says that these "records," "should they exist," "would officially confirm this individual's identity as an employee of the FBI," relying on Exemptions 6 and 7(C). Seidel Decl. ¶ 20. The declarant also attests that Ezeah did not provide a waiver or

---

[3] The *Glomar* doctrine arose from a case involving a classified research ship called the Hughes Glomar Explorer. *Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976). The CIA refused to fulfill a journalist's FOIA request about it because the records were classified; further, the agency said that the ship's existence itself was classified, so whether the records even existed also was statutorily exempt from a FOIA request. *Id.*

release from the third-party individual or proof of the individual's death, it and explains why "official confirmation" of the requested records "could reasonably be expected to draw negative and unlawful attention," stigmatization, and harassment to the individual and any others that could be named in the records.  Seidel Decl. ¶¶ 19–20.  In the absence of any arguments or evidence to the contrary, the FBI has justified its *Glomar* response to Ezeah's second FOIA request.

## IV.

For all these reasons, the Court will grant the FBI's motion for summary judgment.  A separate order will issue.


Dated:  August 15, 2025                                    _____
                                                           TREVOR N. McFADDEN
                                                           United States District Judge